*CJP Supp. 4 Opinion
YEW, Chairperson.
I
INTRODUCTION AND SUMMARY
This disciplinary matter concerns Fresno County Superior Court Judge James M. Petrucelli. The commission commenced this inquiry with the filing *CJP Supp. 5 of its notice of formal proceedings (Notice) on October 8, 2014. The Notice charged Judge Petrucelli with engaging in judicial misconduct by calling the Fresno County Jail and ordering the own recognizance (OR) release of a person he knew socially, Jay Ghazal. The Notice charged the judge with ordering the OR release based on his personal knowledge of Ghazal and ex parte communications with Attorney Jonathan Netzer, who was a personal friend of both Ghazal and the judge. Ghazal had been arrested on spousal abuse charges, and his release violated a statute that prohibits an OR release on such charges prior to a hearing in open court and notice to the prosecution. The Notice also charged Judge Petrucelli with misconduct in conversing with Ghazal at a fundraiser held the evening of Ghazal’s release and, at Ghazal’s request, calling a local defense attorney about representing Ghazal in the criminal matter.
The Supreme Court appointed three special masters, who held an evidentiary hearing and reported to the commission. The masters are the Hon. Stuart R. Poliak, Associate Justice of the Court of Appeal, First Appellate District, Division Three; the Hon. Bradley L. Boeckman, Judge of the Shasta^ County Superior Court; and the Hon. Ronni B. MacLaren, Judge of the Alameda County Superior Court. Judge Petrucelli is represented by Kathleen M. Ewins, Esq., and David S. McMonigle, Esq., of Long and Levit, LLP, in San Francisco, California. The examiners for the commission are Gary W. Schons, Esq., and Assistant Trial Counsel Valerie Marchant, Esq.
A three-day evidentiary hearing was held before the special masters commencing February 2, 2015. The masters filed their report containing their findings of fact and conclusions of law on April 10, 2015. The commission heard oral argument on July 8, 2015.
The masters concluded that Judge Petrucelli engaged in prejudicial misconduct in ordering the OR release of Ghazal under circumstances that violated the California Code of Judicial Ethics, canon 1 (a judge shall uphold the integrity of the judiciary), canon 2 (a judge shall avoid impropriety and the appearance of impropriety), canon 2A (a judge shall respect and comply with the law), canon 2B(1) (a judge shall not allow social relationships to influence judicial conduct), canon 2B(2) (a judge shall not lend the prestige of judicial office to advance the personal interests of others), canon 3B(2) (a judge shall be faithful to the law), and canon 3B(7) (a judge shall accord to every person who has a legal interest in the proceeding the right to be heard). The masters concluded, “In the eyes of the public, Ghazal’s OR release tends to reflect special treatment obtained as a result of personal connections between Ghazal, Netzer and Petrucelli, and thereby tends to diminish public confidence in the objectivity and impartiality of the judiciary.” We agree, and also determine that the judge engaged in conduct prejudicial to the administration of justice that brings the judicial office into disrepute. In issuing this *CJP Supp. 6 censure, the most severe discipline that may be imposed short of removal,[1] we seek to assure the public that judicial action reflecting preferential treatment to friends or family, even if undertaken in good faith, is seriously at odds with the standards of judicial conduct expected of judges in this state.
II
FINDINGS OF FACT AND CONCLUSIONS OF LAW
A. Findings of Fact
The examiner has the burden of proving the charges by clear and convincing evidence. (Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1090 [77 Cal.Rptr.2d 408, 959 P.2d 715] (Broadman).) “Evidence of a charge is clear and convincing so long as there is a ‘high probability’ that the charge is true. [Citations.]” (Ibid.)
Factual findings of the masters are entitled to special weight because the masters have “the advantage of observing the demeanor of the witnesses.” (Broadman, supra, 18 Cal.4th at p. 1090; see Inquiry Concerning Freedman (2007) No. 179 [49 Cal.4th CJP Supp. 223, 232] (Freedman).) In keeping with this standard of deference set by the Supreme Court, we adopt the factual findings of the masters in their entirety. When material to our decision, we make additional factual findings shown by clear and convincing evidence based on our independent review of the record. (Inquiry Concerning Spitzer (2007) No. 182 [49 Cal.4th CJP Supp. 254, 261]; Freedman, supra, 49 Cal.4th CJP Supp. at p. 232; Geiler v. Commission on Judicial Qualifications (1973) 10 Cal.3d 270, 275 [110 Cal.Rptr. 201, 515 P.2d 1] (Geiler).)

OR Release of Ghazal

Judge Petrucelli and Attorney Netzer had been close friends for several years, a friendship developed through their mutual patronage of a cigar shop in Fresno, international trips together in 2012 and 2013, and membership in a men’s group referred to as “HBC”[2] that congregated at the cigar shop. HBC members hosted monthly or quasi-monthly get-togethers at their homes. Judge Petrucelli would disqualify himself from any matter in which Netzer appeared before him.
Fresno businessman Jay Ghazal and Judge Petrucelli met about 10 years ago and became socially acquainted through their mutual membership in *CJP Supp. 7 HBC and social gatherings at the homes of HBC members, including a barbecue at the judge’s home in August 2013. The judge would disqualify himself if Ghazal appeared before him as a criminal defendant.
Ghazal was arrested on Friday night, July 12, 2013, on charges of felony spousal abuse related to an incident with his wife. Ghazal contacted Attorney Netzer from the holding cell. During that evening and into early Saturday morning, Netzer and Ghazal communicated several times by phone and during Netzer’s visit to the jail. Ghazal was “scared and frazzled” because he had not been booked, and thus could not bail out.
At approximately 9:00 a.m. Saturday morning, Netzer sent the following text message to the judge: “Good morning Jim. One of our HBC members was arrested last night on a domestic violence claim. He’s asked that I bail him out this morning. In 22 years of practice, th[is] is a first for me. Do you have any suggestions for me before I head down to jail? Thanks!”
The judge promptly called Netzer and was told that Ghazal was arrested after an incident with his wife in which he grabbed her by the wrist. Netzer told the judge that Ghazal had been in custody for 12 hours without being booked and was scared. The judge volunteered to call the jail.
The judge had heard that Ghazal and his wife were obtaining a divorce, but was not aware of prior domestic violence in the relationship. He was under the impression that Ghazal’s wife had not been physically injured.
After talking with Netzer, Judge Petrucelli called the jail to ask about Ghazal’s booking status, and when he would be available for release on bail. He was transferred to Officer Marylou Merancio who testified that, after he identified himself as Judge Petrucelli, the judge stated he wanted to have an inmate released. The masters found a more complete and accurate statement is that the judge asked when Ghazal would be available for release on bail. Officer Merancio told the judge she would have her supervisor, Officer Crystal Galindo, contact him.
Officer Galindo called the judge at 9:51 a.m., after ascertaining that Ghazal had recently been booked on several charges including felony spousal abuse. The masters found that either Officer Galindo first asked Judge Petrucelli if he wanted Ghazal to be released on his own recognizance or Judge Petrucelli first asked about an OR release, but in all events the judge stated that he would like, or would be comfortable with, an OR release.[3] As Judge *CJP Supp. 8 Petrucelli concedes, who first mentioned the possibility of an OR release is largely immaterial since the judge is responsible for making the order.
Officer Galindo contacted a retired correctional officer for advice and was told that telephonic release orders were not frequent, but were not uncommon. After Judge Petrucelli’s identity as a judge was verified and the judge confirmed that “he wanted to do an over the phone release of inmate Ghazal,” Lieutenant Michael Porter authorized Ghazal’s release. The judge told jail personnel he would be willing to come to the jail and sign any required paperwork, but was informed that would not be necessary. Lieutenant Porter had been familiar with what had been referred to as “honor releases”[4] or “telephonic releases” for 25 years; however, they were rare and it had been some 10 to 15 years since he had last handled one. He instructed jail personnel to complete a written form that existed for that purpose. When the form could not be found, the “honor release” was entered in the jail’s tracking system. Ghazal was released at 10:48 a.m. on Saturday morning.
The release was in violation of Penal Code section 1270.1 (hereafter section 1270.1). That statute provides that before any person arrested for certain offenses, including spousal abuse, may be released on his or her own recognizance, a hearing must be held in open court and the prosecuting attorney and defense attorney must be given “a two-court-day written notice and an opportunity to be heard on the matter.” (Id., subd. (b).)
We find the following facts, which were not included in the masters’ report concerning the information available to Judge Petrucelli at the time he ordered Ghazal’s release, to be relevant to our determinations and supported by clear and convincing evidence based on our independent review of the record. The judge had never met or talked to Ghazal’s wife. The only information the judge obtained about the facts and circumstances of the arrest came from Netzer, and the judge assumed this information came from Netzer’s communications with Ghazal. The judge failed to take any steps to *CJP Supp. 9 check whether Ghazal had a prior criminal history, or to ask Netzer if there had been prior domestic violence incidents.

Contact at Fundraiser and Connecting Ghazal with an Attorney

On the evening of Ghazal’s release, Judge Petrucelli attended a charitable fundraising event attended by approximately 2,000 people, including both Ghazal and Netzer. Ghazal approached the judge and mentioned his upcoming court date. The judge told Ghazal that he could not discuss the matter, but that Ghazal should stay away from his wife. Ghazal asked Judge Petrucelli if he could help him find an attorney and the judge responded that he would see what he could do. The following Monday morning, the judge called Attorney Roger Nuttall, a well-respected criminal defense attorney, and asked if he was willing to speak with an acquaintance who had been arrested on spousal abuse charges. Nuttall said he was, and the judge called Ghazal and gave him Nuttall’s contact information.

Subsequent Events at Court

Monday morning following Ghazal’s release, Gayle Sherwood, a supervisor at the superior court, received an e-mail from a correctional officer at the jail advising that Judge Petrucelli had “honor released” Ghazal, but there was no paperwork to forward to the court reflecting the action. This triggered a series of phone calls and e-mails between court personnel and the judge and his clerk to determine what had occurred and how the situation should be handled. The judge confirmed that he had ordered the release and stated he would sign any required paperwork. The judge’s courtroom clerk sent the following e-mail to a supervising judicial assistant: “After speaking further with Judge, this was not something out of the ordinary or special. He said that he has never been asked to sign anything before so he’s not sure about the paperwork or procedures on their/our end. He will be happy to sign something if you need him to for paperwork purposes in order to have the calendar setting done correctly but neither of us are sure what that might be at this moment. (He tried to phone earlier but was unable to reach you. If you need anything from him, defendant information, etc. then he will be happy to provide that to you if you come up.) Hope that helps.”
That afternoon, Judge Petrucelli called Sherwood expressing his concern for the apparent confusion caused by the absence of normal paperwork. Sherwood testified that the judge was irate and confused; the masters found the judge testified credibly that he was simply frustrated and embarrassed by the confusion and extra work he had caused. During his conversation with Sherwood, the judge confirmed that he had authorized Ghazal’s release and indicated he would disqualify himself from presiding over Ghazal’s case. *CJP Supp. 10 Sherwood testified the judge said something to the effect of “you know how these DV [(domestic violence)] cases are.”
Since neither Sherwood nor the more experienced supervisors she reached out to had any experience with this type of “honor release” from jail, they had to create documents. Ghazal’s matter ultimately was placed on calendar before a different judge.
When the matter was brought to the attention of Presiding Judge Gary Hoff, he promptly spoke with Judge Petrucelli. Judge Hoff told Judge Petrucelli that it was improper for him to handle a matter that was not assigned to him. Judge Petrucelli looked “shocked” and “dumbfounded.” He stated that he thought his conduct was proper based on his understanding that other judges granted telephonic releases, but assured Judge Hoff that he would not do it again.
Judge Hoff told the judge that the matter would need to be reported to the commission and that he would give the judge the opportunity to self-report. Shortly after this conversation, Judge Petrucelli reported the matter to the commission.[5]

Judge Petrucelli’s State of Mind

After listening critically to Judge Petrucelli’s testimony and observing his demeanor, the masters accepted “the truth of his testimony that he believed he was acting properly when he authorized the OR release” based on his awareness that other judges in the past had ordered telephonic OR releases. This finding is supported by the following evidence.
Judge Petrucelli was a deputy sheriff in Fresno between 1974 and 1989. While working in the jail, he was aware of judges ordering telephonic OR releases and had seen a standard form that was used in connection with such releases. Shortly after he took judicial office, the judge had a conversation with then Presiding Judge James Quashnick, who confirmed that telephonic releases were ordered from time to time. Based on the testimony of numerous judges, attorneys, and sheriffs, the masters found the practice was utilized occasionally in the past, and less frequently in recent years. Other witnesses confirmed their understanding that the practice was still in occasional use, tending to confirm that its discontinuance was not universally known, and corroborating Judge Petrucelli’s testimony that he thought the practice still existed. Lieutenant Porter knew of a printed form to be completed for such a *CJP Supp. 11 release, although the form could not be located at the time of Ghazal’s release. During the judge’s discussions with jail personnel, no one suggested that there was any impropriety in authorizing Ghazal’s OR release.
Based on his personal knowledge of Ghazal’s reputation as an upstanding member of the community, Judge Petrucelli concluded Ghazal was not a flight risk or a danger to his wife or others. He believed Ghazal would be subject to an emergency protective order upon release.
The masters found that the judge’s belief that his actions were proper was corroborated by his reaction when questioned by his presiding judge. Judge Petrucelli acknowledged what he had done without attempting to conceal or twist the facts and Judge Hoff perceived that Judge Petrucelli was truly “amazed” to learn he had done something improper and that the past practice with which he was familiar was no longer considered appropriate.
Based on the foregoing evidence, we adopt the masters’ finding that Judge Petrucelli believed he was acting in accordance with an established practice. Nevertheless, we consider the judge to have been exceedingly remiss in failing to inquire whether the “honor release” practice he became aware of years earlier was still considered proper, whether it was ever considered proper in a matter in which the judge would otherwise be disqualified, and whether there had been any changes in the law that would prohibit such a release.[6] Such inquiries might have prevented the judge from going down the path that led to these proceedings and this censure. The following additional facts from the record which were not included in the masters’ report support our finding in this regard.
Judge Petrucelli could not recall the last time he heard of a judge issuing a telephonic OR release, but thought it was probably years and years ago. Judge Hoff may have been aware of the telephonic OR release practice in the past, but since becoming a judge in 1994, he has not heard of any judge, other than Judge Petrucelli, issuing a telephonic OR release. Judge Hoff has had several terms as presiding judge since the early 2000’s. When Justice Gene M. Gomes was a superior court judge in Fresno from 1982 to 2002, he occasionally received calls from attorneys requesting OR releases of their clients. He does not know if the practice has ended, but believes if it does still occur, it is less frequent because of changes in the law, such as the Victims’ Bill of Rights, which limit a judge’s authority to engage in this practice. Earlier in his practice, Attorney Nuttall occasionally called a judge *CJP Supp. 12 on the weekend to request an OR release for a client, even in a domestic violence case. Although Nuttall believes the practice is still ongoing, but less frequent, he stopped asking for telephonic releases around 2000 because times had changed, he thought it put the judge in an awkward position, and he no longer felt comfortable doing this.
Significantly, witnesses who confirmed the existence of a telephonic release practice in Fresno County described it in terms that would not have authorized Ghazal’s release based on the limited information obtained by Judge Petrucelli. When Justice James Ardaiz was a trial judge in Fresno from 1981 until 1988, he occasionally received calls at home from attorneys requesting an OR release of a client. He only considered the request for nonviolent offenses, he insisted on being apprised accurately of the facts by either speaking with the arresting officer or the district attorney (DA), and he would require that the DA be contacted to determine if he or she objected to an OR release. When Lenore Schreiber was a judge in Fresno County from 1978 until 1982, she occasionally received calls at home from attorneys requesting OR releases for their clients. She asked the attorneys a series of questions, including whether the arrestee had an arrest record or prior convictions and the circumstances of the arrest, and she tried to speak with the arresting officer. Before Judge Ralph Nunez retired from the Fresno County Superior Court in 2003, he sometimes received calls from attorneys over the weekend requesting OR releases. If the attorney could not provide information on the arrestee’s criminal background and arrest history, he called the jail to get the information.
In contrast to the process used by other judges, Judge Petrucelli relied entirely on information provided by Netzer, information he assumed came from Ghazal, and made no effort to determine independently the facts that led to the arrest, whether the wife was injured, or whether Ghazal had a history of domestic violence or criminal convictions. Nor did he make any effort to determine if Ghazal’s wife or the DA objected to the release.
The masters also found that the examiner failed to prove that Judge Petrucelli acted for the corrupt purpose of using his judicial office to benefit a friend — a purpose other than the faithful discharge of judicial duties. The masters found that the judge ordered Ghazal’s release because he was “genuinely concerned that an individual was being held in jail for some 12 hours unable to obtain release either on bail or on his own recognizance,” and not simply because of his acquaintance with Ghazal or his friendship with Netzer.
Based on a cold record of the transcript of the hearing, we have difficulty agreeing with the masters’ factual finding that the judge acted out of concern *CJP Supp. 13 for a citizen rather than for the sole purpose of helping Netzer and Ghazal, a friend and acquaintance. The fact that the judge did not inquire whether other citizens were being held in jail for a long period without being able to post bail might suggest otherwise. However, the special masters are experienced jurists who had the advantage of seeing and hearing Judge Petrucelli testify over two days. While the commission has the authority to override the findings of the special masters, we are mindful that credibility determinations of the special masters are to be given “ ‘special weight’ ” where they are based on the masters’ observations of the witness’s demeanor at a hearing. (Broadman, supra, 18 Cal.4th at p. 1090; Freedman, supra, 49 Cal.4th CJP Supp. at p. 243.) Therefore, we defer to the masters’ finding that the judge did not act for a corrupt purpose or in bad faith.
B. Conclusions of Law
1. OR Release

Level of Misconduct

The masters concluded that in ordering the OR release of Ghazal, Judge Petrucelli violated California Code of Judicial Ethics, canons 1, 2, 2A, 2B(1), 2B(2), 3B(2), and 3B(7). We agree and adopt these legal conclusions as our own.[7]
A violation of the Code of Judicial Ethics constitutes one of three levels of judicial misconduct: willful misconduct, prejudicial misconduct, or improper action. A judge who engages in willful or prejudicial misconduct may be subject to censure or removal. (Cal. Const., art. VI, § 18, subd. (d).) The masters concluded that Judge Petrucelli engaged in prejudicial misconduct by ordering Ghazal’s OR release. Prejudicial misconduct is “conduct prejudicial to the administration of justice that brings the judicial office into disrepute.” (Cal. Const., art. VI, § 18, subd. (d).) Prejudicial misconduct while acting in a judicial capacity does not require bad faith; rather, it is “conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office.” (Geiler, supra, 10 Cal.3d at p. 284.) We concur with the masters that the judge’s conduct in ordering the OR release of an acquaintance based on the request of a friend diminishes public confidence in the objectivity and impartiality of the judiciary.
*CJP Supp. 14 The examiner maintains that the judge committed willful misconduct, the most serious form of judicial misconduct. Willful misconduct is unjudicial conduct that is committed in bad faith by a judge acting in a judicial capacity. (Broadman, supra, 18 Cal.4th at p. 1091.) Neither party disputes that Judge Petrucelli engaged in unjudicial conduct[8] and was acting in a judicial capacity when he ordered Ghazal’s release. The issue in dispute is whether the judge acted in bad faith.
A judge acts in bad faith “only by (1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge’s lawful judicial power, or (3) performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.” (Broadman, supra, 18 Cal.4th at p. 1092.)
In Broadman, the Supreme Court held that the intentional commission of an act the judge “ ‘should have known’ ” was beyond the judge’s lawful authority is insufficient to prove that the judge acted in bad faith. (Broadman, supra, 18 Cal.4th at pp. 1091-1092.) However, the court stated: “Because transgressing the limits of a judge’s lawful authority is not the faithful discharge of judicial duties, a judge who performs such acts with no regard at all for whether they are legally permitted cannot be said to be acting with a purpose to faithfully discharge judicial duties. Thus, a judge’s reckless or utter indifference to whether judicial acts being performed exceed the bounds of the judge’s prescribed power is a state of mind properly characterized as bad faith.” (Id. at p. 1092.)
The examiner urges the commission to address whether the particular circumstances here establish that Judge Petrucelli acted in “conscious disregard” of the limits of his judicial authority, or with a “reckless or utter indifference” to whether he was. acting within his judicial power. In the examiner’s view, the judge’s state of mind was “tantamount to willful ignorance,” because he relied on a practice he learned of years earlier and inade no inquiry as to any applicable law before acting. The examiner also contends that the judge acted for a corrupt purpose even if he believed the process he employed was proper because his purpose was not the faithful discharge of judicial duties, but to obtain the release of someone he knew whose well-being was the subject of a friend’s concern.
We consider the judge’s failure to make inquiries into the current state of the law and the propriety of authorizing a telephonic release of an inmate *CJP Supp. 15 charged with spousal abuse to be exceptionally careless and irresponsible. However, based on the factual findings of the masters to which we have deferred, we conclude that this state of mind does not constitute clear and convincing evidence that the judge acted with a conscious disregard or a reckless or utter indifference to the limits of his judicial authority or for a corrupt purpose. The masters provided the following persuasive support for their conclusion that Judge Petrucelli did not act in bad faith: the judge testified credibly that he believed he was acting within his authority; the judge’s experience as a deputy sheriff and his conversation with then Presiding Judge Quashnick shortly after he took the bench provided a basis for his belief that telephonic releases were appropriate; the evidence established the practice was ongoing, although to a far more limited extent; and correctional officers did not question the judge’s authority to OR release Ghazal and mentioned a form that had been used for telephonic releases.
We agree with the examiner that Judge Petrucelli should have known to make further inquiries before relying on a practice he learned of years earlier and should have considered whether the practice he relied on included ordering the release of persons with whom a judge had a relationship requiring disqualification. However, should have does not constitute bad faith. In the context of willful misconduct, Broadman equates bad faith with actual malice. (Broadman, supra, 18 Cal.4th at pp. 1091-1092.) We do not suggest that bad faith can only be established through an admission by the judge that he or she consciously acted outside the bounds of judicial authority. In Freedman, supra, 49 Cal.4th CJP Supp. 223, the judge testified he was not conscious of his delayed matters when he signed salary affidavits attesting that he did not have delayed cases under submission. The masters found this testimony to be credible. The commission adopted the masters’ factual finding concerning the judge’s state of mind, but concluded that in those instances where the judge executed salary affidavits shortly after being informed of having delayed matters, he acted with an utter indifference to whether the affidavits were true or false.
However, under the circumstances of this case, the evidence does not prove by clear and convincing evidence that Judge Petrucelli acted with an utter indifference to whether his actions exceeded his judicial authority.
The examiner also urges us to reject the masters’ finding that the judge did not act for a corrupt purpose, and instead find that he acted for the sole purpose of helping an acquaintance at the behest of his good friend, a purpose other than the faithful discharge of judicial duties. Although our review of the record has given us pause, we decline to reject the masters’ finding that the judge did not act for a corrupt purpose in deference to the special weight to which the credibility findings of the special masters are entitled.
*CJP Supp. 16 Commission decisions cited by the examiner do not convince us to reject the masters’ conclusion that Judge Petrucelli did not act in bad faith. In each of those cases, the masters made factual findings that the judge acted in bad faith, supporting the conclusion that the judge engaged in willful misconduct. (Inquiry Concerning Stanford (2012) No. 190 [53 Cal.4th CJP Supp. 1] (,Stanford) [judge conceded he acted for a purpose other than the faithful discharge of judicial duties by, in nine instances, diverting traffic tickets of family and friends to his own court and suspending fees and fines]; Inquiry Concerning O’Flaherty (2010) No. 188 [50 Cal.4th CJP Supp. 1] [judge issued no-contact order with knowledge that it was beyond his judicial authority to do so]; Inquiry Concerning Platt (2002) No. 162 [48 Cal.4th CJP Supp. 227] (Platt) [masters rejected the judge’s testimony that he did not realize that his actions were wrong when he dismissed several traffic tickets not before him for people he knew and attempted to influence other judicial officers on behalf of people he knew].)
For these reasons, we adopt the masters’ legal conclusion that Judge Petrucelli’s conduct in authorizing the OR release of Ghazal constitutes prejudicial misconduct.

Canon 3E( 1) Violation

The Notice charged the judge with violating California Code of Judicial Ethics, canon 3E(1), which requires a judge to disqualify himself or herself in any proceeding in which disqualification is required by law. Judge Petrucelli does not dispute that he would have been disqualified from presiding over Ghazal’s criminal case in court and from presiding over any matter in which Netzer represented a party. However, he maintains that a telephonic OR release from jail is not subject to disqualification because it does not constitute a “proceeding” within the meaning of canon 3E(1). The examiner urges the commission to find a violation of canon 3E(1) because the judge’s failure to disqualify himself encompasses “the essence of the misconduct.”
The terminology section of the Code of Judicial Ethics defines both “impending proceeding” and “pending proceeding.” An “impending proceeding” is defined as: “[A] proceeding or matter that is imminent or expected to occur in the near future. The words ‘proceeding’ and ‘matter’ are used interchangeably, and are intended to have the same meaning.” A “pending proceeding” is defined as: “[A] proceeding or matter that has commenced. A proceeding continues to be pending through any period during which an appeal may be filed and any appellate process until final disposition. The words ‘proceeding’ and ‘matter’ are used interchangeably, and are intended to have the same meaning.” Both definitions refer to specific canons, but neither refers to California Code of Judicial Ethics, canon 3E(1).
*CJP Supp. 17 Judge Petrucelli took judicial action after Ghazal had been arrested, but before the matter appeared in court. Because California Code of Judicial Ethics, canon 3E(1) refers only to “proceeding,” rather than “pending” or “impending” proceeding, we must address the question of whether a proceeding requiring disqualification includes matters that are expected to occur in court in the near future or is limited to court proceedings.
The rules governing interpretation of statutes, constitutional provisions and voter initiatives provide guidance. First, words must be construed in accordance with their usual and ordinary meaning. (The Recorder v. Commission on Judicial Performance (1999) 72 Cal.App.4th 258, 268-269 [85 Cal.Rptr.2d 56] (Recorder); Lennane v. Franchise Tax Bd. (1994) 9 Cal.4th 263, 268 [36 Cal.Rptr.2d 563, 885 P.2d 976].) Second, where there is ambiguity, the language must be given a fair and reasonable interpretation, with due regard to the purpose sought to be accomplished. (Cedars of Lebanon Hosp. v. County of L. A. (1950) 35 Cal.2d 729, 734-735 [221 P.2d 31, 15 A.L.R.2d 1045].)
First, we look at the ordinary meaning of “proceeding” and “matter” (the terminology section of the Code of Judicial Ethics states that “proceeding” and “matter” are used interchangeably and are intended to have the same meaning). Common dictionary definitions of “proceeding” include event, official record of a thing said or done, legal action, and transaction. (Merriam-Webster’s Collegiate Dict. (11th ed. 2012) p. 990; Santos v. Brown (2015) 238 Cal.App.4th 398, 416 [189 Cal.Rptr.3d 234].) “Matter” in this context is defined as a subject under consideration, a subject of disagreement or litigation, something to be proved in law. (Merriam-Webster’s Collegiate Dict., supra, at p. 766.)
The Supreme Court has described the term “proceeding” as malleable, the meaning of which depends on the context and subject to which it relates. (Recorder, supra, 72 Cal.App.4th at p. 270.) “ ‘Proceeding’ in a legal context generally refers to the conduct of judicial business . . . .” (Santos, supra, 238 Cal.App.4th at p. 416.) Judge Petrucelli does not dispute that he was taking judicial action when he ordered Ghazal’s release. In the commission’s view, the usual and ordinary meaning of “proceeding,” both in a common and in a legal context, encompasses judicial action in ordering an OR release from jail.
To the extent there is ambiguity, we interpret “proceeding” in a manner that effectuates the intent or purpose of the canon. The purpose of a canon *CJP Supp. 18 requiring disqualification as required by law is to “assure the parties and the public of the integrity and fairness of the judicial process.” (Rothman, Cal. Judicial Conduct Handbook (3d ed. 2007) 7.00, p. 293.) Thus, disqualification benefits not only the parties, but the public as a whole. (Flamm, Judicial Disqualification (2d ed. 2007) 17.5, p. 497.) If “proceeding” is limited to actions pending in court, a judge with a disqualifying interest would not be disqualified from making probable cause determinations and signing search and arrest warrants. (See In re Krull (Iowa 2015) 860 N.W.2d 38 [magistrate reprimanded for violating Iowa rule requiring disqualification from any “proceeding” in which the judicial officer’s impartiality might reasonably be questioned by signing a prearrest warrant to search the residence of a person with whom the judge had a relationship requiring disqualification].) A narrow interpretation of “proceeding” that excludes judicial action taken before a criminal case is filed would defeat the intent of California Code of Judicial Ethics, canon 3E(1) — to assure the public that judicial action will be exercised impartially. This purpose is best accomplished through an interpretation of “proceeding” that encompasses prefiling judicial determinations.
Having determined that California Code of Judicial Ethics, canon 3E(1) applies to the telephonic OR release process employed by Judge Petrucelli, we turn to the question of whether the judge was required to disqualify himself. Grounds for disqualification by law include when a person aware of the facts might reasonably entertain a doubt about the judge’s impartiality, when the judge believes there is a substantial doubt as to his or her ability to be fair, and when the judge has personal knowledge of disputed facts. (Code Civ. Proc., § 170.1, subd. (a)(6)(A)(ii), (iii), (1)(A), (B).) Judge Petrucelli testified that he would disqualify himself from any matter in which Netzer appeared as an attorney and from any criminal case in which Ghazal was a defendant. Moreover, while the judge describes Ghazal as an “acquaintance,” the relationship is sufficiently close that a person aware of the facts might reasonably entertain a doubt about the judge’s impartiality. (Code Civ. Proc., § 170.1, subd. (a)(6)(A)(iii).) The judge, Netzer, and Ghazal belonged to HBC, a group of 10 to 13 individuals who socialized together and hosted social events at their homes every month or two. Ghazal attended approximately half of these events. The judge made judicial determinations in relation to his decision to OR release Ghazal based on his personal knowledge and opinion of Ghazal. Further, through his contacts with HBC members, the judge acquired information about Ghazal’s relationship with his wife that could be material to the spousal abuse charges for which Ghazal was arrested and prosecuted. He also considered facts he knew from his personal relationship with Ghazal, such as Ghazal’s close relationship with his daughter, in making a judicial determination concerning his flight risk.
As Special Master MacLaren observed in her inquiry of the judge: “[I]s this a fair statement, that factors that caused you [(the judge)] to believe that *CJP Supp. 19 this would be an appropriate situation for an honor release, namely, that this was someone known in the community, a person of relative good standing, you were unaware of any past run-ins with the law, did not believe him to be a flight risk or a danger to the public, that that’s what — that’s what made you comfortable going forward with asking for the honor release .... [¶] ... [¶] And it was those same facts that also would have caused you to disqualify yourself because . . . that would be information you have about this individual and a prior relationship that would raise doubts about your ability to be fair?” The judge agreed this was a fair statement.
For these reasons, we conclude that Judge Petrucelli violated California Code of Judicial Ethics, canon 3E(1) by failing to disqualify himself from making a determination concerning Ghazal’s release from jail.
2. Contacts at Fundraising Event and Assisting Ghazal in Retaining an Attorney
The masters concluded that Judge Petrucelli’s brief remarks to Ghazal at a fundraiser on the evening of his release and the calls he made to put Ghazal in touch with an attorney do not constitute misconduct. We agree that the brief remarks at the fundraiser, a contact initiated by Ghazal, do not constitute misconduct. However, we conclude that the judge’s efforts to assist Ghazal in retaining an attorney constitute violations of California Code of Judicial Ethics, canons 2 (judge shall avoid appearance of impropriety) and 2A (judge shall act in a manner that promotes public confidence in the integrity and impartiality of the judiciary). The judge called Attorney Nuttall[9] about representing Ghazal after having just taken judicial action to obtain Ghazal’s release. He then called Ghazal on his cell phone and gave him Nuttall’s contact information. Under these circumstances, the judge’s efforts to put Ghazal in touch with Nuttall reinforces the appearance that he was acting to benefit a friend and undermines public confidence in the impartiality of the judiciary.
Ill
DISCIPLINE
Judge Petrucelli has engaged in serious misconduct involving the misuse of judicial office, conduct that reflects poorly on the impartiality and integrity of the judiciary. Considered together with his history of prior discipline, his misconduct might warrant removal. (See post, p. Supp. 22). However, after careful consideration of the multiple factors discussed below, including that *CJP Supp. 20 this is an isolated incident, and in deference to the masters’ finding that the judge acted in good faith, we have determined to impose this severe censure rather than the ultimate sanction of removal.[10]
Determining the appropriate discipline depends to a large extent on the nature and number of incidents of misconduct. (Furey v. Commission on Judicial Performance (1987) 43 Cal.3d 1297, 1307, fn. 2 [240 Cal.Rptr. 859, 743 P.2d 919].) First, we look to whether the misconduct is an isolated incident or whether there are a number of incidents demonstrating a pattern of misconduct. (Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 918 [81 Cal.Rptr.2d 58, 968 P.2d 958].) Although Judge Petrucelli committed multiple ethical violations within a course of conduct, the crux of his misconduct involved the OR release of Ghazal. There is no indication that he has engaged in a pattern of similar misconduct. As such, we agree with the masters that the misconduct is an isolated incident and does not reflect a pattern.
It is not only the number of incidents of misconduct that guides our determination of the appropriate level of discipline. The nature and seriousness of the misconduct is an equally important consideration. A single incident of misconduct may itself be sufficiently serious, particularly if of a corrupt nature, to warrant severe discipline, including removal. (Inquiry Concerning MacEachern (2008) No. 184 [49 Cal.4th CJP Supp. 289, 307].)
Judge Petrucelli has committed serious misconduct, though not of a corrupt nature. Not only did he abuse his authority by taking judicial action in a matter that had not been assigned to him and contrary to section 1270.1, he did so under circumstances that created the appearance that he was providing special treatment to his friend and acquaintance. The commission has repeatedly condemned conduct that creates the appearance of a “two-track system of justice — one for those with special access to the judge, and the other for everyone else.” (Inquiry Concerning Wasilenko (2005) No. 170 [49 Cal.4th CJP Supp. 26, 51]; see, e.g., Platt, supra, 48 Cal.4th CJP Supp. 227; Stanford, supra, 53 Cal.4th CJP Supp. at p. 43; Inquiry Concerning Mills (2013) No. 192 [57 Cal.4th CJP Supp. 1, 13].) Providing procedural shortcuts or lenient treatment to friends or family “subverts the impartiality of the judicial system and undermines respect for the judiciary as a whole.” (Stanford, supra, 53 Cal.4th CJP Supp. at p. 25.) While many of the commission decisions in this regard involve traffic tickets, we consider the release of a person arrested for spousal abuse to be even more serious and detrimental to public esteem for the judiciary because it raises public safety concerns.
*CJP Supp. 21 In aggravation, the judge failed to make independent inquiries concerning the facts and circumstances of the domestic abuse incident that led to Ghazal’s arrest and failed to comply with section 1270.1. The limitations on issuing OR releases of defendants arrested for spousal abuse protect the victim by giving the prosecutor and the victim notice and an opportunity to object to the defendant’s release.[11] Without that opportunity, the victim’s safety could be jeopardized.
Judge Petrucelli testified that he was not aware of section 1270.1. When asked whether, as a judge, he had a duty to be knowledgeable about the law, he testified, “Certainly that is my duty, but today as much as we do, I don’t know that I can keep up with or any judge can keep up on all of the changes and all of the different laws that we deal with.” Section 1270.1 was enacted in 1999 and the Victims’ Bill of Rights (Marsy’s Law), which includes other pertinent rights and protections guaranteed to victims, was enacted in 2008. The public has a right to expect that judges keep abreast of changes in the law before taking judicial action, particularly changes that affect public safety.
A Fresno County district attorney stated that the district attorney’s office would be deeply concerned about anyone booked on domestic violence charges being released without notice and without an opportunity for the district attorney to be heard. He believes it diminishes the criminal justice system for one branch to act unilaterally without complying with the requirements of the statute. We agree.
Judge Petrucelli presented evidence of his background in working on domestic violence issues and his sensitivity to victims of domestic violence. He was instrumental in instituting a roundtable in Fresno County to work on ways to provide assistance to victims of domestic violence and to educate the public about domestic violence. He received awards for his work with domestic violence. This background makes it all the more troubling that Judge Petrucelli was not sensitive to the risks inherent in releasing a person arrested for spousal abuse without contacting the alleged victim, the police or *CJP Supp. 22 the prosecutor or conducting a criminal background check. Instead, his conduct created the appearance that he allowed his personal relationships with Ghazal and Netzer to overshadow his judicial responsibility to ensure public safety and treated this case differently than he treated other domestic violence cases.
We have also taken into consideration Judge Petrucelli’s history of prior discipline. Judge Petrucelli previously has been disciplined three times: he was publicly admonished in 2007 and received two advisory letters, in 2001 and 2002. For the most part, the basis of the prior discipline pertained to the judge’s courtroom demeanor and did not involve conduct similar to the misconduct in this matter. However, the judge’s 2002 advisory letter included his misconduct in failing to disqualify himself in matters involving an attorney with whom he had practiced and had a continued financial arrangement (he did disclose) in violation of California Code of Judicial Ethics, canon 3E(1), the same canon he violated in this matter.
In mitigation, Judge Petrucelli acknowledges the impropriety and serious nature of his misconduct and immediately took responsibility when confronted by his presiding judge. This is an important factor since recognition of the impropriety and nature of wrongdoing is essential to a willingness and capacity to reform. (Platt, supra, 48 Cal.4th CJP Supp. at p. 248.)
Further, the record supports the masters’ finding that Judge Petrucelli is a dedicated, hardworking judge who has contributed positively to the workings of the court and to his community. Judicial colleagues described his excellent work ethic and willingness to accept all assignments. Attorneys and others who appear or work in the judge’s courtroom praised the judge’s judicial behavior and performance. Members of the community described Judge Petrucelli’s commitment to public service and to charitable causes and programs.
Balancing the foregoing factors, the commission concludes that the purposes of judicial discipline — protection'of the public, enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system — can be accomplished through a severe censure. Accordingly, pursuant to article VI, section 18 of the California Constitution, the commission hereby imposes this public censure of Judge Petrucelli.
Commission members Hon. Erica R. Yew, Ms. Pattyl A. Rasparían, Hon. Thomas M. Maddock, Hon. Ignazio J. Ruvolo, Mr. Richard Simpson, and Mr. Adam N. Torres voted in favor of all the findings and conclusions expressed herein and in the order imposing a severe public censure. Commission members Ms. Mary Lou Aranguren and Ms. Sandra Talcott voted in *CJP Supp. 23 favor of imposition of a severe public censure and all the findings and conclusions expressed herein, except the commission’s conclusion that the judge’s conduct in ordering Ghazal’s OR release does not constitute willful-misconduct. Commission members Dr. Michael A. Moodian and Nanci E. Nishimura, Esq., did not participate. Commission member Anthony P. Capozzi, Esq., was recused.

 See California Constitution, article VI, section 18, subdivision (d).

 HBC stands for Having Big Cigars.

 The examiner requests that the commission find that the judge admitted he formed the intent to OR release Ghazal before he spoke to Officer Galindo. This request is based on Judge Petrucelli’s testimony that he “probably” made the decision to OR release Ghazal while he was *CJP Supp. 8 waiting for Officer Galindo to call him (after his initial phone contact with Officer Merancio). However, the judge also testified that if he were going to pinpoint a period in time when he decided to order the OR release, “it would probably be at the time or right before [he] talked with Officer Galindo, and she said, ‘Did you want him released?’ And [he] said, ‘Yeah, I’m comfortable with that.’ She said, ‘Do you want to release him on his own recognizance?’ [He] said, ‘Yeah, let me know what I need to do, I’d like to do that.’ ” When Special Master Poliak asked who first raised or mentioned the possibility of an OR release, the judge responded that he did not recall and could not say unequivocally, but thinks he said something to Officer Galindo like “ ‘I’m comfortable with that,’ ” but he “very well may have said I want him released.” Because the judge’s testimony on this point was equivocal, we conclude the masters correctly found that the first mention of an OR release could have come from either the judge or Officer Galindo.

 The term “honor release” was used by some witnesses in reference to a telephonic OR release.

 We do not consider Judge Petrucelli’s self-report to the commission to be a mitigating factor when he did so at the direction of his presiding judge and was told the presiding judge would report him if he did not do so himself.

 In addition to section 1270.1, enacted in 1999, the Victims’ Bill of Rights (Marsy’s Law), enacted in 2008, significantly expands the rights of victims in California, including requiring the court to consider the safety of the victim and the victim’s family in fixing the amount of bail and release conditions for the defendant. (Cal. Const., art. I, § 28, subd. (b).)

 The judge was also charged with violating California Code of Judicial Ethics, canon 3E(1), which requires disqualification as required by law. The masters declined to reach a legal conclusion with respect to this canon. As discussed later, we conclude the judge violated canon 3E(1) in ordering an OR release in a matter for which he was disqualified.

 Failure to comply with the canons of judicial ethics is generally considered to constitute unjudicial conduct. (Adams v. Commission on Judicial Performance (1994) 8 Cal.4th 630, 662 [34 Cal.Rptr.2d 641, 882 P.2d 358].)

 Judge Petrucelli recuses himself from hearing Nuttall’s cases.

 In our analysis of the appropriate level of discipline, we include the aggravating and mitigating factors discussed in the masters’ report to the extent we consider those factors to be aggravating or mitigating.

 The legislative history of section 1270.1 states in pertinent part: “The Legislature . . . finds that it is necessary that a judge or magistrate be fully informed of all aspects of the charged crimes and any and all possible relevant background information about the defendant, including prior violent acts, the threat of prior violent acts, possession of dangerous and deadly weapons, prior arrests and convictions, violations of law, jail incident reports, and the existence of any other relevant information and, in particular, information that may bear on the danger the defendant may present to the public and the likelihood that defendant may commit future crimes if released pending trial. . . . The Legislature further finds that it is necessary for both the victim or victims to have the opportunity to be heard regarding the setting of bail in order to bring relevant information to the court’s attention.” (Stats. 1999, ch. 703, § 1, pp. 5081-5082.)